**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TIMOTHY WALKER,              )<br>                    Plaintiff        )<br>                                              )<br>    v.                                        )<br>                                              )<br>SUPERINTENDENT MARILYN  )<br>BROOKS, et al.,                        ) | C.A. No. 07-280 Erie<br><br>Magistrate Judge Baxter |

**MEMORANDUM OPINION**[1]

Magistrate Judge Susan Paradise Baxter

**I.      INTRODUCTION**

   **A.      Relevant Procedural History**

On October 15, 2007, Plaintiff Timothy Walker, a prisoner incarcerated at the State Correctional Institution at Albion, Pennsylvania ("SCI-Albion"), commenced this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983. Named as Defendants are: Marilyn Brooks, former Superintendent at SCI-Albion ("Brooks"); Nancy Giroux, Deputy Superintendent at SCI-Albion ("Giroux"); Dr. Mark Baker, a physician under contract to provide medical services to inmates at SCI-Albion ("Baker"); Daniel Telega, a physician's assistant under contract to provide medical services to inmates at SCI-Albion ("Telega"); Maxine Overton, Corrections Health Care Administrator at SCI-Albion ("Overton"); Christine Zirkle, a registered nurse at SCI-Albion ("Zirkle"); and the Pennsylvania Department of Corrections ("DOC"). [Document # 1]. Defendants Baker and Telega are hereafter referred to collectively as "Medical Defendants", while the remaining Defendants will be referred to collectively as "DOC Defendants."

In his complaint, Plaintiff alleges that Defendants violated his rights under the eight amendment to the United States Constitution by: (i) refusing to allow him to undergo medically-

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (Document ## 19, 20, 22).

recommended hip replacement surgery, both while he was confined in SCI-Albion's Restricted Housing Unit ("RHU") and after he was released back to general population; and (ii) failing to give him strong enough medication for his pain. (Complaint at pp. 1-2). Plaintiff further challenges SCI-Albion's "blanket policy of classifying medically recommended surgeries not necessary to save the patient's life as 'elective' and failing to allow inmates in the RHU to elect surgeries necessary to alleviate severe pain." (Complaint at ¶ 96). Plaintiff also claims that Defendants' failure to grant him a reasonable accommodation to allow him to receive hip replacement surgery violated his rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq*. ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq*. ("Rehabilitation Act").

Both the Medical Defendants and the DOC Defendants have filed motions for summary judgment [Document ## 36 and 42, respectively], and Plaintiff has filed a consolidated response to the same. [Document # 48]. This matter is now ripe for consideration.

### B.     Relevant Factual History

On August 22, 2006, Defendant Baker referred Plaintiff to Dr. Habusta, an outside orthopedic surgeon, for a consultation regarding Plaintiff's progressive arthritis and pain in his left hip. (Document # 40, Exhibit A, Baker deposition transcript, at pp. 17-19). At the time, Plaintiff had been receiving Methadone, a narcotic, for his hip pain; however, the Methadone was discontinued on November 2, 2006, due to misuse, because Plaintiff was discovered "fishing medication" to other inmates. (Document # 40, Exhibit A, Baker deposition transcript, at p. 83; Exhibit E, Overton deposition transcript, at pp. 32, 34; and Exhibit G, Plaintiff deposition transcript, at pp. 32-33). After the Methadone was discontinued, Plaintiff was prescribed several different pain medications and muscle relaxants, at various times, including Diclophen, Ultram, Naprosyn, Ultram with Tylenol, Motrin, Flexeril, Parafon forte DFC, Baclofen, Elavil, and Voltaren. (Document # 40, Exhibit A, Baker deposition transcript, at pp. 79-83; Exhibit B,

2

Telega deposition transcript, at pp. 29, 42, 55, 60; Exhibit F, Zirkle deposition transcript, at pp. 23, 24, 39, 51; and Exhibit G., Plaintiff deposition transcript, at p. 35).

Plaintiff saw Dr. Habusta on November 28, 2006, at which time Dr. Habusta recommended that Plaintiff undergo a left total hip arthroplasty. (Complaint at ¶ 22; Document # 40, Exhibit A, Baker deposition transcript, at pp. 27-28, 36; and Exhibit B, Telega deposition transcript, at p. 16). Dr. Habusta explained that the risks of hip replacement surgery included fracture, loss of blood, infection, and having to remove the replacement hip. (Document # 40, Exhibit G, Walker deposition transcript, at pp. 48-50). Plaintiff was also informed that he would need physical therapy after the surgery to aid his recovery. (Id. at p. 58; Exhibit A, Baker deposition transcript at p. 41).

At the time of Dr. Habusta's recommendation, Plaintiff was confined in SCI-Albion's Restricted Housing Unit ("RHU"). Because of the lack of good postoperative care and physical therapy follow up in the RHU, the hip replacement surgery was deferred until after Plaintiff was released from the RHU. (Document # 40, Exhibit A, Baker deposition transcript, at p. 54-55).

On December 6, 2006, Defendant Baker reviewed Dr. Habusta's recommendations and ordered a course of physical therapy, which was not typically provided to inmates in the RHU. (Document # 40, Exhibit A, Baker deposition transcript, at pp. 42-43; Exhibit E, Overton deposition transcript, at p. 52). The physical therapist gave Plaintiff exercises he could do on his own in the RHU while awaiting surgery. (Document # 40, Exhibit G, Walker deposition transcript, at pp. 52-53).

Plaintiff was released from the RHU at the end of August 2007. (Complaint at ¶ 31). Defendant Baker saw Plaintiff on October 17, 2007, and requested approval for Plaintiff's hip replacement surgery on October 25, 2007. (Document # 40, Exhibit A, Baker deposition transcript, at pp. 61, 95). The surgery was subsequently postponed because preoperative blood work revealed a low platelet count. After repeat blood work showed Plaintiff's platelet count to be stable, he was scheduled for surgery, which was performed on March 10, 2008. (Id. at p. 98).

3

### C.     Standards of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine as to any material fact and that the moving party is entitled to a judgment as matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(non-movant must present affirmative evidence-more than a scintilla but less than a preponderance-to support his claims). When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002) quoting Battaglia v. McKendry, 233 F.3d 720, 722 (3d Cir. 2000). Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements, rather, "the party opposing the motion must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." In re Ikon Office Solutions, 277 F.3d 658, 666 (3d Cir. 2002).

On a motion for summary judgment, the district court may not weigh the credibility or weight of the evidence, rather, it may only determine the existence of a triable issue of fact. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**D.     Discussion**

**1.     Eighth Amendment Claims**

In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). "In order to establish a violation of [the] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury" White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted).

Here, Plaintiff claims that Defendants violated his Eighth Amendment rights by: (i) deliberately delaying his access to medical services for a serious medical need for non-medical reasons; (ii) creating and/or enforcing a blanket policy of classifying medically recommended surgeries not necessary to save the patient's life as "elective" and failing to allow inmates in the RHU to elect surgeries necessary to alleviate severe pain; (iii) deliberately failing to provide him with a medically recommended surgery because of his housing status; (iv) deliberately withholding needed medical treatment as an incentive to improve his behavior; and (v)

deliberately failing to provide him with and/or delaying the provision of a medically recommended surgery after his release from RHU. (Complaint at ¶¶ 95-99).

### a. Medical Defendants
#### i. Expert Medical Testimony

The Medical Defendants argue that Plaintiff cannot establish an Eighth Amendment claim because he has failed to obtain medical expert testimony to prove that the delay in providing hip replacement surgery caused him actual harm.[2] Based upon the record, this Court disagrees that medical expert testimony is required to establish that Plaintiff had a serious medical need in this case.

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correction Institute Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). Here, there is no question that Plaintiff's hip condition caused him to suffer significant pain, as evidenced by the numerous prescription pain medications he was administered during his course of conservative treatment. Yet, despite this regimen of medication, Plaintiff's pain persisted. In fact, Defendant Overton acknowledged at her deposition that the Medical Defendants "didn't expect all of [Plaintiff's] pain to be alleviated with the medication that he's getting" in lieu of surgery. (Document # 40, Exhibit F, Overton deposition transcript, at p. 58). Hip replacement surgery was recommended as the ultimate solution to alleviate Plaintiff's hip pain. Thus, a lay person could readily understand from the

---

[2] The Medical Defendants cite Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) as authority for the proposition that "expert testimony is required to support allegations of serious medical need." (Document # 37, Medical Defendants' Brief, at p. 6). However, no such bright line rule was set forth by the Spruill court. In fact, the court in Spruill merely determined that the plaintiff had alleged a serious medical need sufficiently to overcome a motion to dismiss, but that "this will need to be fleshed out with further evidence (e.g., expert medical testimony)" at a later stage in the proceeding. Spruill, 372 F.3d at 236. This hardly qualifies as a mandate requiring expert medical testimony to support allegations of serious medical need.

existing record that Plaintiff had a serious medical need and that, absent surgery, his pain would persist.

### ii.     Deliberate Indifference

Alternatively, the Medical Defendants contend that Plaintiff has failed to establish that they acted with deliberate indifference to his serious medical needs.  Instead, the Medical Defendants' assert that "[Plaintiff's] claims boil down to a dissatisfaction with the speed with which his noncritical hip condition is being corrected." (Document # 37, Medical Defendants' Brief, at p. 9).  The Court disagrees with this characterization of Plaintiff's claim.

While the "speed" at which Plaintiff ultimately received his hip replacement surgery is certainly called into question, the crux of Plaintiff's claim is that the delay in providing surgery was attributable to a non-medical reason - namely, Plaintiff's RHU status.  Both Medical Defendants have acknowledged that the primary reason Plaintiff did not receive surgery until more than a year after surgery was recommended was that he was confined in the RHU, where proper post-operative care and physical therapy were not made available. (Document # 40, Exhibit A, Baker deposition transcript, at p. 41, 54-55; Exhibit B, Telega deposition transcript, at pp. 41, 61).  However, they made no effort to determine how long Plaintiff was expected to remain in the RHU.  (Document # 40, Exhibit A, Baker deposition transcript, at pp. 28-29, 39-41; Exhibit B, Telega deposition transcript, at pp. 23-25, 27).  This occurred even though the Medical Defendants were well aware that Plaintiff would continue to suffer persistent hip pain, which would not be adequately alleviated by pain medication or conservative treatment.  In fact, the very reason Plaintiff was sent to an orthopedic specialist was his progressive left hip pain and "continued problems walking." (Document # 40, Exhibit A, Baker deposition transcript, at p. 16). At that time, x-ray findings confirmed that Plaintiff had "progressive arthritic changes" in his left hip, which provided an objective basis for Plaintiff's persistent pain complaints. (Id. at p. 21).  Moreover, Defendant Telega acknowledged that surgery is considered an option only

"[w]hen the deterioration [in the hip] is severe and significantly inhibits the patient's activities of daily living, where pain medications are ineffective." (Document # 40, Exhibit B, Telega deposition transcript, at p. 10).

Nevertheless, Defendant Baker was rather dismissive of Plaintiff's pain complaints after the decision was made to defer surgery until Plaintiff was released from the RHU. In particular, on April 4, 2007, the first time Defendant Baker saw Plaintiff after the surgery recommendation of November 28, 2006, Defendant Baker surmised that "patient [is] allowed out of cell one hour maximum per RHU rules and with decreased ambulation his complaints of pain and discomfort should not be worsened while he's in RHU." (Document # 40, Exhibit A, Baker deposition transcript, at p. 55). This observation was made despite the fact that Plaintiff had consistently and continuously voiced complaints of persistent pain during medical visits and in numerous requests to staff leading up to his visit with Defendant Baker on April 4, 2007. (Document # 40, Exhibit I; Complaint, Exhibits B-EE). Moreover, Plaintiff asserts in his Declaration attached to the Complaint that the pain in his hip, in fact, worsened while he was in the RHU, causing him to experience difficulties sleeping and bending over. (Complaint, Exhibit A).

In light of the significant delay in providing recommended surgery due to Plaintiff's RHU status, the recognized need for the surgery, the Medical Defendants' awareness of Plaintiff's continuing complaints of pain while awaiting surgery, and the ineffectiveness of pain medication to alleviate the pain, this Court finds that there are genuine issues of material fact as to whether the Medical Defendants' were deliberately indifferent to Plaintiff's serious medical needs under Durmer. Accordingly, the Medical Defendants' motion for summary judgment regarding Plaintiff's Eighth Amendment claim against them, is denied.

### b. DOC Defendants
#### i. Deliberate Indifference

The DOC Defendants argue that Plaintiff's Eighth Amendment deliberate indifference

claim against them should be dismissed because they are non-medical prison officials. In particular, the DOC Defendants contend that Plaintiff is unable to establish that they possessed the requisite *scienter* of deliberate indifference because he has failed to show that they had knowledge or reason to believe that prison medical staff was mistreating or failing to treat him. (Document # 43, DOC Defendants' Brief, at pp. 4-5, citing Spruill, 372 F. 3d at 236.). Furthermore, the DOC Defendants argue that "the decision to defer [Plaintiff's] surgery until his release from the RHU was made by medical practitioners without any input, direction or influence by the DOC and the administrators at SCI-Albion." (Id. at p. 8).

Plaintiff counters that the DOC Defendants' "development and application of a practice that denies non-life-threatening surgeries to inmates in the RHU allowed [the Medical] Defendants to abdicate their roles as medical providers." (Document # 48, Plaintiff's Consolidated Response, at p. 13). Moreover, Plaintiff argues that the DOC Defendants "had the ability to work with [the Medical] Defendants to address how to make the necessary surgery available to [Plaintiff]," and instead "used [Plaintiff's] need for surgery as an incentive to improve his behavior." (Id. at p. 14).

In order to sustain his Eighth Amendment claim against the DOC Defendants, Plaintiff must show that the Defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." A.M. v. Luzerne County Juvenile Detention Ctr., 372 F.3d 572, 586 (3d Cir. 1004), quoting Stoneking v. Bradford Area School District, 882 F.2d 720, 727 (3d Cir. 1989). Here, Plaintiff has adduced the following testimony from Defendant Overton essentially acknowledging the existence of a blanket policy denying the provision of non-emergent surgeries to RHU inmates at SCI-Albion:

> Q. And so, regardless of – so the only thing, then that is preventing an RHU inmate from having a nonemergent surgery would be the fact that they're in the RHU?
>
> A. It would be the fact that it's not emergent, yeah.

9

> Q. So I just want to clarify that. The nonemergent surgeries are never provided to RHU inmates; is that what you're telling me?
>
> A. Right.

(Document # 40, Exhibit E, Overton deposition transcript, at p. 22).  Overton then confirmed that Plaintiff's RHU status prevented him from receiving the recommended surgery:

> Q. ... You were asked questions about whether it was [Plaintiff's] behavior that was preventing his surgery, and I just want to ask you, just so we're clear, was it the fact that he was in the RHU that prevented him from receiving the surgery?
>
> A. Yes.
>
> Q. So whether he was in the RHU because of his behavior before he got to the RHU or because of his behavior while he was in the RHU, was it the fact that he was in the RHU that prevented surgery from taking place?
>
> A. Yes.

(Id. at pp. 73-74).

Overton also acknowledged that, in applying the foregoing policy, Plaintiff's level of pain was not considered in determining whether surgery would be provided:

> Q. In stating that [Plaintiff's] surgery was not urgent, did you consider the level of pain that he was in?
>
> A. I – that had no bearing on it.
>
> Q. And stating that his surgery was not urgent, did you consider his ability to function based on what he had told you in his grievance?
>
> A. Well there is – if you look in the notes from – from the PA, it doesn't indicate that this guy is bedridden....

(Id. at pp. 48-49).

Based on the foregoing testimony, a reasonable jury could find that the DOC Defendants established and maintained a policy or practice of preventing RHU inmates from having non-emergent surgeries, that this policy or practice was established and enforced without regard to the level of pain the inmate may be experiencing, and that the enforcement of this policy prevented Plaintiff from having the recommended hip replacement surgery while he was in the

RHU.  As a result, there are genuine issues of material fact as to whether the DOC Defendants' establishment and enforcement of such a policy constituted deliberate indifference to Plaintiff's serious medical needs by denying recommended hip replacement surgery for non-medical reasons.  Accordingly, the DOC Defendants' motion for summary judgment based on Plaintiff's alleged failure to establish deliberate indifference in the context of his Eighth Amendment claim against them is denied.

### ii.    Qualified Immunity

In the alternative, the DOC Defendants contend that they are entitled to summary judgment based on the doctrine of qualified immunity.  The doctrine of qualified immunity insulates government officials from liability for damages insofar as their conduct does not violate clearly established rights.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  An officer performing his discretionary functions is "shielded from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Curley v. Klem, 278 F.3d 271, 277 (3d Cir. 2002).  "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."  Hope v. Pelzer, 530 U.S. 730, 739  (2002).[3]

The analytical framework that district courts have previously employed in determining whether the defense of qualified immunity applied was set forth by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001).  The Third Circuit summarized that framework as follows:

> The [Supreme] Court explained that a qualified immunity analysis must begin with this threshold question: do the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the

---

[3] In other words, "[w]hen an officer's actions give rise to a §1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as shield from suit.  The primary purpose of affording public officials qualified immunity, thus insulating them from suit, is to protect them from undue interference with their duties and from potentially disabling threats of liability.  The privilege of qualified immunity, however, can be overcome when state officials violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Wright v. City of Philadelphia, 409 F.3d 595, 599-600 (3d Cir. 2005) (internal citations omitted).

11

>officer's conduct violated a constitutional right? Saucier, 121 S.Ct at 2156. If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary. If, however, the alleged facts show that there was a constitutional violation, then the next step is to ask whether the right was clearly established. See id. In other words, a court must consider whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. This inquiry, the Court noted, must be undertaken in light of the specific context of the case, not as a broad general proposition. Id. If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity. See id. at 2156-57.

Curley, 278 F.3d at 277. See also Hope, 536 U.S. 730; Doe v. Delie, 257, F.3d 309 (3d Cir. 2001).

However, the rigid two-step inquiry set forth in Saucier has recently been relaxed by the Supreme Court in Pearson v. Callahan, 555 U.S. ___, 129 S.Ct. 808 (Jan. 21, 2009). See also Bumgarner v. Hart, 2009 WL 567227 (3d Cir. March 6, 2009). As the Supreme Court explained: "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case." Pearson, ___ U.S. at ___, 129 S.Ct. at 821.

Another district court within this Circuit recently summarized the current state of the *Saucier* framework in the post-*Pearson* era:

>By noting that in many instances a court need not reach whether a constitutional violation is alleged to determine if qualified immunity is appropriate, the Court stated that the first prong "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." In addition, "[a]lthough the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent," the first prong "create[s] a risk of bad decisionmaking," specifically in those instances where a court decides a rather nuanced constitutional claim early on in litigation where the factual basis for the claims have not been fully developed through discovery. Thus, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

DeLauri v. New Jersey Div. of State Police, 2009 WL 222983, at *5 (D.N.J., Jan. 27, 2009), quoting Pearson, ___ U.S. at ___, 129 S.Ct. at 818-20. See also Newland v. Reehorst, 2009 WL 1298414, at *2 (3d Cir. May 12, 2009) (proceeding directly to the second step of the *Saucier* analysis).

The Court has already determined that there is a genuine issue of material fact as to the first prong of the *Saucier* test - whether Defendants' alleged conduct violated Plaintiff's constitutional rights. As a result, this Court will proceed straight to the second prong of the *Saucier* analysis - whether the right claimed by Plaintiff was "clearly established" at the time of the alleged conduct.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the length of pre-existing law the unlawfulness must be apparent." Hope, 536 U.S. at 739. In other words, "to be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right." Karnes v. Skrutski, 62 F.3d 485, 492 (3d Cir. 1995).

Here, it has long been established that inmates have an Eighth Amendment right to medical care. See Estelle v. Gamble, 429 U.S. 97 (1976).[4] It is also clearly established that deliberate indifference encompasses "delayed medical treatment for non-medical reasons, denial

---

[4] "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." Estelle, 429 U.S. at 104.

of prescribed medical treatment, [and] denial of reasonable requests for treatment that results in suffering or risk of injury." Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993). Nonetheless, the DOC Defendants contend that this case is one of first impression because they "could not locate any other case where an inmate's elective surgery was deferred because the inmate was in restrictive custody because of prison misconducts." (Document # 43, DOC Defendants' Brief, at p. 19). Accordingly, the DOC Defendants argue that the constitutional right they are alleged to have violated was not "clearly established law."

While it is true that this Court "must consider whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," and that this inquiry should "be undertaken in light of the specific context of the case, not as a broad general proposition," Curley, 278 F.3d at 277, quoting Saucier, the Court believes the DOC Defendants have construed the test too narrowly. As the Supreme Court explained in Hope v. Pelzer, in some cases "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." 536 U.S. at 741 (citations omitted). Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. Such is the case here.

As previously noted, it was clearly established at the time of the DOC Defendants' alleged conduct that the contours of the law defining Eighth Amendment deliberate indifference included the denial of recommended medical treatment for non-medical reasons, especially where such denial results in the plaintiff's continued pain and suffering. Thus, the existing case law provided sufficient notice to the DOC Defendants that their alleged conduct, even under the novel factual circumstances of this case, fell within the confines of Plaintiff's clearly established rights under the Eighth Amendment. Accordingly, the DOC Defendants' motion for summary judgment based on qualified immunity is denied.

### c. Punitive Damages

The Medical Defendants contend that Plaintiff's claim for punitive damages must be dismissed because Plaintiff has failed to establish that they "acted with a bad motive or intent or exhibited extreme or outrageous conduct." (Document # 37, Medical Defendants' Brief, at p. 11). However, "[a] jury may assess punitive damages in a civil rights action when the defendant's conduct is shown to be motivated by evil motive or intent, *or when it involves reckless or callous indifference to the federally protected rights of others*." Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir. 2000). The standard to show "callous indifference" to a federally protected right has been found to be essentially the same standard as "deliberate indifference" under the Eighth Amendment. Bermudez v. City of Philadelphia, 2007 WL 1816469 (E.D.Pa. June 21, 2007). In reaching this conclusion, the Eastern District Court in Bermudez explained that "[b]ecause the Court concludes that Bermudez has stated facts which, if proven, could demonstrate that the Defendants were deliberately indifferent to his serious medical needs, it follows logically that 'reckless or callous indifference' has been noticed. Hence, there is a proper basis for a request for punitive damages." Id. at * 3.

This Court agrees with this conclusion and applies the same reasoning here. If Plaintiff succeeds in proving his claim of deliberate indifference, which has been adequately alleged, then he may be entitled to recover punitive damages based on Defendants' "reckless or callous indifference to his federally protected rights." As a result, the Medical Defendants' motion to dismiss Plaintiff's request for punitive damages is denied.

### 2. ADA and Rehabilitation Act Claims

In addition to his Eighth Amendment claims, Plaintiff alleges that the Defendants violated Title II of the ADA and Section 504 of the Rehabilitation Act by "failing to grant [his] reasonable accommodation request for an exception to the RHU surgery policy and/or to make a reasonable accommodation to allow an inmate to receive a needed surgery and aftercare."

(Complaint at ¶¶ 100-101).

Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services or activities of a public entity or be subjected to discrimination by such entity." 42 U.S.C. § 12132. The term "public entity," as defined by Title II of the ADA, does not include individuals. 42 U.S.C. § 12131(1). Thus, the law is clear that individuals, sued in their official capacities, are not "public entities" under the ADA and are not subject to liability thereunder. Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002)(individuals are not subject to liability under Titles I or II of the ADA).[5] Accordingly, Plaintiff's ADA claims against the Defendants are barred as a matter of law and must be dismissed.

Similarly, "[c]ourts within this circuit have held that individuals cannot be held liable under the Rehabilitation Act." Taylor v. Altoona Area School District, 513 F.Supp.2d 540, 556 (W.D.Pa. 2007), citing, inter alia, A.W. v. The Jersey City Public Schools, 486 F.3d 791, 804 (3d Cir. 2007)("Suits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals"). As a result, Plaintiff's Rehabilitation Act claims must also be dismissed.

An appropriate Order follows.

---

[5] The Court notes that an exception to this general rule has been recognized by the Third Circuit to the extent a plaintiff seeks prospective injunctive relief against state officials acting in their official capacities. Koslow v. Commonwealth of Pa., 302 F.3d 161, 178 (3d Cir. 2002). In this case, Plaintiff does seek injunctive relief, "including a change in policy to the provision of medically recommended surgeries to inmates in the RHU requiring prison officials to consider an inmate's duration and level of pain and suffering before denying surgery." (Complaint at ¶ 102d). However, to assert a cognizable ADA claim, a plaintiff must assert that he was subject to discrimination "by reason of [his] disability." Here, Plaintiff makes no such claim. Instead, according to Plaintiff, any alleged "discrimination" occurred as a result of his status as an inmate in SCI-Albion's RHU. This is insufficient to establish a claim under the ADA.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY WALKER, | ) | |
| Plaintiff | ) | C.A. No. 07-280 Erie |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Baxter |
| SUPERINTENDENT MARILYN | ) | |
| BROOKS, et al., | ) | |

**<u>ORDER</u>**

AND NOW, this 30th day of September, 2009;

IT IS HEREBY ORDERED that the motions for summary judgment filed by the Medical Defendants [Document # 36] and the DOC Defendants [Document # 42] are granted in part and denied in part, as follows:

1. Summary judgment is denied both the Medical Defendants and the DOC Defendants with regard to Plaintiff's Eighth Amendment deliberate indifference claims;

2. Summary judgment is denied the Medical Defendants with regard to Plaintiff's request for punitive damages; and

3. Summary judgment is granted both the Medical Defendants and the DOC Defendants with regard to Plaintiff's ADA and Rehabilitation Act claims.

S/Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge